MISSISSIPPI STATE HIGHWAY COMMISSION *v.* SPIERS, et ux.

No. 43272          February 22, 1965          172 So. 2d 208

*Tate Thigpen, G. B. Keaton,* Picayune, for appellant.

*Williams* & *Williams,* Poplarville, for appellees.

KYLE, P. J.

This case is before us on appeal by the Mississippi State Highway Commission from a judgment of the Circuit Court of Pearl River County rendered in favor of the appellees, James C. Spiers and his wife, for the sum of $50,000, as compensation and damages for the taking of a strip of land, containing 43.78 acres, to be used for highway right of way purposes in the construction of a new interstate highway running through and across the appellees' 336-acre tract of land situated approximately eight or nine miles northeast of the City of Picayune in the southern part of Pearl River County.

The record shows that the Mississippi State Highway Commission, on July 26, 1962, filed with the Clerk of the Circuit Court of Pearl River County its application for the organization of a special court of eminent domain for the condemnation of the above mentioned strip of land owned by the appellees for highway right of way

purposes. The new highway for which a right of way was being acquired was Interstate Highway No. 59, a limited access four-lane highway running from Meridian in a southwesterly direction through the cities of Laurel and Hattiesburg, and thence southwestwardly along the route laid out by the State Highway Commission to the City of New Orleans.

The record shows that the appellees' 336-acre tract of land constituted a fractional part of Section 34, Township 4 South, Range 6 West, and a fractional part of Section 3, Township 5 South, Range 16 West, all in Pearl River County. According to the application for condemnation of the above mentioned strip of land for right of way purposes, the new highway was to enter the appellees' land from a northeasterly direction a short distance south of the northeast corner thereof and then run thence diagonally in a southeasterly direction through and across the appellees' land to the point of intersection with the south boundary line of the appellees' land in Section 3, Township 5 South, Range 16 West.

At the time the eminent domain suit was filed the 336-acre tract of land was being used by the appellees, James C. Spiers and wife, as a cattle farm and for the pasturage of horses. The northern portion of the 336-acre tract was traversed by a gravel county road running in a general easterly and westerly direction which, according to the plans for the construction of the interstate highway, was to be relocated and reconstructed with an overpass across the interstate highway.

Much of the appellees' land at the time the eminent domain suit was filed was cutover land referred to in the record as woodland pasture. The remaining part of the land was open land, including 40 acres of bahia grass land, 81 acres of unimproved native grass land, approximately 8 acres of crop land, and 1 acre of pecan trees. The dwelling house, which appears to have been

unoccupied at the time of the filing of the eminent domain suit, and the barn were situated south of the above mentioned county road and west of the proposed new highway. The strip of land sought to be condemned and taken included 14 acres of woodland pasture, 22 acres of bahia grass land and 7 acres of native grass land. Approximately 169.43 acres of the 336-acre tract lying east of the strip of land sought to be condemned, after the construction of the limited access highway, will be cut off entirely from the remaining land owned by the appellees lying west of the new highway, and approximately 68.28 acres in the southwest corner of the 336-acre tract will be cut off from the remaining 54.53 acres lying west of the new highway.

The record shows that a special court of eminent domain was organized for the trial of the eminent domain suit and the case was tried on July 25, 1962. The jury returned a verdict awarding compensation and damages to the owners in the amount of $35,000, and a judgment was entered for that amount. From that judgment the State Highway Commission prosecuted an appeal to the circuit court. The case was tried anew in the circuit court at the regular April 1963 term thereof, and the jury returned a verdict in favor of the landowners for the sum of $50,000. The appellants filed a motion for a new trial, alleging as grounds therefor that the verdict of the jury was so excessive as to denote bias and prejudice on the part of the jury and was not supported by a preponderance of the evidence. The court overruled the appellant's motion for a new trial, and from the judgment entered in favor of the appellee landowners for the above stated sum of $50,000, the appellant has prosecuted this appeal.

The appellant's attorneys have assigned and argued four points as grounds for reversal of the judgment of the lower court.

It is first argued that there is no credible evidence in the record to support the verdict of the jury, and the verdict is so excessive as to denote bias and prejudice on the part of the jury. In as much as we have reached the conclusion that the judgment must be reversed and a new trial granted for the reasons thus stated, it is not necessary that we consider the other points assigned and argued in the appellant's brief.

Four witnesses were called to testify by the State Highway Commission on the issue as to the amount of compensation which should be paid to the landowners on account of the taking of the 43.78-acre strip for highway right of way purposes.

Charles B. Moore, a licensed real estate broker with considerable experience in appraising the value of farm lands and timber lands testified that he made an inspection and appraisal of the Spiers land for the State Highway Commission during the month of July 1962 for the purpose of determining the fair market value of the land before and after the taking of the 43-acre strip of land for highway purposes. He stated that in his opinion the fair market value of the 336-acres before the taking was $48,290; after the taking, $35,400; and that the differences in value after the taking amounted to $12,800. The witness was asked whether he knew of recent sales of comparable property, which might be used as a basis for the valuation of the Spiers property before and after the taking. His answer was that he knew of several such sales. He mentioned the sale of the Gonzales farm containing 160 acres and fronting on the Sycamore paved road, which was sold to George Spiers on June 6, 1961; the sale of the Harrison Penton farm, situated about three miles from the Spiers' property and fronting on a blacktop road, which was sold to Charles F. White on September 9, 1961; the sale of the Benton Pigott place, situated approximately three miles from the Spiers land, which was sold to Sam Dyer

on March 29, 1961; and the sale of the Hillcrest Farm, which was a large farm with pecan trees and tung trees and quite a bit of open land and timber land, and which was sold to the present owners in 1960. The witness stated that he considered the lands involved in each of those sales as comparable to the Spiers land. The witness stated that, after the construction of the new highway, the 169 acres of the Spiers land lying east of the new highway would be cut off from the rest of the Spiers land, and in estimating the amount of damages to be paid to the defendants he had included an amount sufficient to cover the cost of a right of way from the east end of the overhead bridge on the county road to the north boundary line of the 169-acre tract. He stated that the defendants would have access to the 23-acre tract lying north of the county road after the construction of the new highway.

J. W. Morgan testified that he lived at Mozelle in Jones County where he owned a 120-acre farm; that he had received a B.S. degree from Mississippi State University and had received credit for 15 hours of graduate work in agriculture at that institution; that he had taught agriculture in the public schools of the state for a period of several years, that he had been employed as an appraiser by the State Highway Commission for a period of 4½ years. He stated that he had made an appraisal of the Spiers property in July 1962; that in his opinion the market value of the Spiers property before the taking of the 43.78-acre strip of land for highway purposes was $45,000; that the market value of the property after the taking was $31,500; that the difference between the market value of the property before the taking and the market value after the taking was $13,500. Morgan stated that he knew of several recent sales of comparable farm lands in the vicinity of the Spiers property. He then mentioned the sale of the Hillcrest Farm, containing approximately 1320 acres,

situated about one-half mile south of the Spiers property; the sale of the 80-acre farm known as the Harrison Penton place; the sale of the Benton Pigott place containing approximately 200 acres, and the sale of the Gonzales land situated near the corporate limits of the City of Picayune to George Spiers.

On cross-examination by the defendants' attorneys Morgan stated that the Harrison Penton place, with the buildings thereon, had been sold to Charles White for a price equal to $281 per acre; that the Pigott place had been sold for $210 per acre; that the Hillcrest farm, which had better pasture land and more buildings thereon than the Spiers' farm, had been sold for $132,000, or approximately $100 per acre. Morgan stated that the Spiers' farm was being operated as a cattle farm, with a few horses, but it was not being used to the fullest extent; that around the barn there was an improved pasture and north of the county road there was an improved pasture, but the southeast portion of the 336-acre tract was an "old field lying there more or less doing nothing"; that there was no improved pasture on that acreage and bushes were growing up. Morgan stated that, in estimating the value of the property left after the taking of the 43.78-acre strip for right of way purposes, he made due allowance for the decrease in value due to the fact that the land was being divided into four parts.

Edward O. Robinson testified that he lived at Picayune and was engaged in the real estate business; that he had appraised many tracts of farm lands in Pearl River County and the northern portion of Hancock County. Robinson stated that he had made an appraisal of the Spiers property for the State Highway Commission a few days prior to July 25, 1962; that in his opinion the fair market value of the Spiers property before the taking of the 43.78-acre strip for highway purposes was $58.100; that the fair market value of the property

after the taking of the 43.78-acre strip was $41,600; and that the difference between the value of the property before the taking and the value after the taking was $16,500. Robinson stated that in making his appraisal of the Spiers property he gave due consideration to recent sales of comparable farm properties in the general vicinity of the Spiers property. He mentioned in particular the sale of the Benton Pigott land to Sam Dyer, and the sale of the Gonzales land to George Spiers. The witness stated that, in making his appraisal of the property after the taking, he took into consideration the fact that the land lying south of the county road was divided into three separate parcels as a result of the taking of the 43.78-acre strip of land for highway purposes. He also considered the cost of construction of fences on each side of the right of way and the cost of providing new approaches to the reconstructed county road to enable the owners of the land to cross over the road from one side to the other side. He also took into consideration the fact that there was a pond which would be destroyed for all practical purposes by the taking of the strip of land for the limited access highway. On cross-examination Robinson was asked whether he considered the sale of three acres of land sold by F. S. Lumpkin to Carl Carlson, the three acres being located on the road to the Roche property. He stated that he did not consider that as comparable property. The 3-acre tract sold by Lumpkin to Carlson was situated east of Carriere and was a different type of property, and was used for different purposes other than grazing land or farm land.

F. L. Abrogast testified that he lived four miles west of Carriere, and he owned a tung and grass farm containing 230 acres; that he was a licensed real estate broker; that he had acted as field appraiser for the Veterans' Administration and the Federal Housing Administration, that he had also appraised property for

the Mississippi Savings and Loan Association and the Jefferson Standard Life Insurance Company. Abrogast stated that he appraised the Spiers property on July 18, 1962; that in his opinion the fair market value of the property before the taking of the 43-acre strip for right of way purposes was $45,210; after the taking, $31,685; the difference in value before and after the taking $13,-525. He stated that he had made investigations of recent sales of comparable property, and had made use of the information thus obtained in arriving at his valuation of the Spiers property before and after the taking. He mentioned especially the sale of a tract of land containing 137 acres by Lynn Cucula to Betty Graves in 1961. He stated that the tract of land referred to was located on Highway 11 and had a tung orchard on it, also scattered pine timber. In his opinion the land was comparable to the Spiers land. The witness also mentioned the sale of the Gonzales land to George Spiers on June 6, 1961, and the sale of 354 acres of land on Highway No. 11 by Joe Jones to Walter Harwell in March 1962; the sale of 158 acres of land by the Bank of Picayune to Arnold Knight on March 28, 1962. The witness stated that the last mentioned tract of land was located 8 or 9 miles east of Picayune and was being used for the growing of tung trees and for pasturage. The witness also mentioned the sale of 1320 acres of land by W. A. Alexander to Hillcrest Farm, Inc.

The defendant, James C. Spiers, testifying in his own behalf, testified that his land was located a little less than four miles east of McNeil on the road known as the McNeil and Camp Roland road, which had a blacktop surface to a point about nine-tenths of a mile from his farm. He stated that he was familiar with the market value of farm properties in that area; that in his opinion the value of the 336 acres of land owned by him before the taking of the 43.78-acre strip for highway purposes was $64,900; that the value of the prop-

erty left to him after the taking was $20,390, and that the amount of compensation and damages which should be awarded to him was $44,510. He stated that in arriving at that figure he had taken into consideration the value of the 43.78 acres of land taken for the limited access highway, which included 14 acres of woodland pasture, 22 acres in bahia grass pasture and 7 acres in native grass pasture. He had also considered the cost of fences which would be needed on each side of the highway, and the damages resulting from the severance of the 169 acres of land on the east side of his farm from the acreage left to him on the west side, and the severance of the 68-acre parcel of land in the southwest corner of his farm from the balance of the land left to him on the west side of the highway. He stated that prior to the taking of the 43.78-acre strip of land for highway purposes he was operating his cattle farm as a single unit; that his barn was located on that part of the 336-acre tract lying south of the county road, and west of the right of way taken for the new highway; that he kept his feed and tools in the barn, and prior to the taking he could drive his truck or automobile or tractor to any place on the farm; that after the taking it would be impossible for him to operate his farm as a single unit. He stated that he had two ponds and a natural spring on the 43.78-acre strip that was being taken, and one of the ponds was a big pond or reservoir where he could water 100 head of cattle the year-round.

On cross-examination Spiers was asked whether he had information concerning sales of comparable property in the locality. His answer was that he did have such information concerning sales of comparable property in the locality. He then mentioned the sale of a 3-acre parcel of land by F. S. Lumpkin to Carl Carlson for $1,000 an acre. The sale was made on July 1, 1961. The 3-acre parcel of land was situated 2½ miles south of Spiers own farm, and he considered the property

as comparable to his own property. He admitted that the three acres sold to Carlson had a frontage of 200 feet on a hard-surfaced road and that the parcel of land had pecan trees on it. Spiers also mentioned as comparable property a 2½-acre lot adjacent to the village of Carriers which was sold by J. C. Ford to Central Service and Supply Company for $2,500. The witness was asked what was the per acre value of the 68-acre tract of land in the southwest corner of his farm, which was not taken for highway purposes. His answer was that land of that kind was being sold for $250 an acre. The witness stated that the land lying north of the county road which was to be relocated was Orangeburg soil and the most valuable land on his farm. He estimated that land as being worth $300 per acre. The witness was then asked how he arrived at a $90 an acre value of his land after the taking, if the land mentioned above was selling for $250 or $300 per acre. His answer was that it would be hard to sell that kind of land after it was cut up like that to people who would want it for the pasturage of cattle or livestock.

Four other witnesses were called to testify as witnesses for the defendants.

C. C. Barefoot testified that he lived in Pearl River County; that he was a licensed real estate salesman and had been engaged in the real estate business since January 1962; that during that time he had appraised farm property and business property and had investigated the sale prices of lands all over Pearl River County. He stated that he appraised the James C. Spiers property on July 17, 1962, and in his opinion the value of the Spiers property prior to the taking of the 43.78 acres of land for right of way purposes was $82,890, that the after taking value of the property was $40,869, and that the damages which resulted from the taking amounted to $42,029. Barefoot was asked whether, in arriving at his values, he made use of any information

concerning recent sales of other property comparable to the Spiers property. He stated that he did, but there were no sales that he could find right in that vicinity so he had to get his information elsewhere. He then stated that he considered the sale made by F. S. Lumpkin to Carl Carlson of three acres of land about two miles from Carriere which had a frontage of approximately 600 feet on a blacktop highway, and the sale made by J. C. Ford to Central Service and Supply Company of 2½ acres of land about 500 or 600 yards from the post office in the village of Carriere as comparable sales for determining the value of the land involved in this proceeding. He also considered the sale by Mrs. Grace Kiefer Knoll to Lemuel Pearson of about 50 acres of land across from the Pine Hill Cafe and Tourist Court on Highway No. 11 above Picayune, as comparable to the Spiers property. The witness stated that he thought those three sales were sufficient to justify the valuation which he placed on the Spiers property. The witness was asked about the sale of the 80-acre tract of land sold by Harrison Penton to Charles F. White. He stated that he thought about that sale, but that property was sold cheap and was not comparable. The witness was then asked about the sale of 221 acres of land by Benton Pigott to Sam Dyer, which was the sale of property nearer the Spiers property than the Lumpkin-Carlson property. He admitted that that property was sold for $200 an acre with all improvements on it, including a brick dwelling house and barns and stock ponds. The witness stated that he did not consider that sale for the reason that Mr. Pigott, the owner of the land, sold it because the doctor told him that he could not work any more, and in that respect it was a forced sale. The witness was asked whether he was familiar with the sale by Caroline Rupple Berringer to H. H. Pepper of 300 acres in tung for $20,000. He stated that he had not looked up the record on that sale, but he had heard Mr. Pepper say that "he didn't give what it was worth."

O. A. Davis testified that he lived in the northeastern part of Pearl River County and that he was 73 years old; that he was a graduate of Mississippi A & M College (now known as Mississippi State University), with a B. S. degree in Agriculture; that he had a considerable amount of experience in appraising property in Pearl River County. He stated that he made an appraisal of the Spiers property about the middle of July 1962; that in his opinion the fair market value of the property before the taking of the 43.78-acre strip for highway purposes was $137,400; that the fair market value of the property after the taking of the 43-acre strip was $92,296; that the difference in the before and after taking values or the damages, was $45,104. On cross-examination the witness was asked whether he had taken into consideration any recent sales of comparable property in that locality. His answer was that he had taken into consideration the sale by F. S. Lumpkin of three acres of land fronting on the Carriere-West & Union Road to Carl Carlson at $1000 an acre; also the 2½-acre lot near the village of Carriere, which was sold for $2500 an acre to Central Service and Supply Company in April 1962, to be used as a building site.

Ferris E. Tate testified that he had lived in Pearl River County all of his life; that the business in which he was engaged was a real estate business; that he had made appraisals of farm lands and other properties in various parts of the county, and was familiar with the market value of lands all over the county. He stated that he had inspected the Spiers property on July 17, 1962, and in his opinion the fair market value of the property before the taking of the 43.78-acre strip for right of way purposes was $80,100; after the taking, $31,690; and that the difference in between the value of the land before the taking of the 43.78-acre strip and the value after the taking was $48,410. The witness was questioned at length concerning the various elements

of damages which he took into consideration in determining the amount of compensation that should be awarded to the defendants for the taking of the strip of land for highway purposes. He mentioned in particular the distances Mr. Spiers would be required to travel to get from one side of his place to the other after the limited access highway had been completed.

On cross-examination the witness admitted that he did not have a license as a real estate appraiser and that he did not list property for sale or sell property on commission for other people. The witness was asked who lived in the dwelling house on the Spiers place. His answer was he thought it was vacant. The witness was then asked what other properties he used as a basis for the comparison in attempting to place a value on the Spiers property. His answer was that he considered the 3-acre parcel of land sold by F. S. Lumpkin to Carl Carlson for the sum of $3,000; the 2½-acre lot sold by J. C. Ford to Central Service and Supply in April 1962 for the sum of $2500; also the 2½-acre lot sold by A. D. McLemore to J. E. Mitchell for the sum of $3,500. He also considered the sale by M. J. Keifer to Lemuel Pearson and Ben O. Griffith of 52 acres of land with frontage on Highway No. 11 right across the highway from the Pine Hill Tourist Court for $325 per acre. The witness stated that he did not consider any sales other than those mentioned above in determining the value of the Spiers property.

E. F. Loe testified that he graduated from Louisiana State University with a Forestry degree in 1938; that he had lived in Picayune for 17 years; and that he was operating a real estate business under the name of Ford-Loe Real Estate Company. Loe stated that he made an inspection and an appraisal of the Spiers property on July 17, 1962; that in his opinion the fair market value of the property before the taking of the highway right of way was $63,400, and after the taking, $24,840;

and that the owners were entitled to compensation and damages in the sum of $38,560. On cross-examination Loe was asked whether, at the time he made his appraisal, he had information as to recent sales of comparable property in that locality. His answer was, that he knew of no recent sales of comparable property close to the Spiers property, but he considered adjusted values of property in that area. He considered the sale of some property east of Carriere by F. S. Lumpkin for $1000 an acre. He considered the fact that his firm had sold 54 acres of land below Picayune which had a frontage of 700 feet on Highway No. 11, for $26,000. The witness stated that his firm had also sold 2½ acres of land just below Carriere to Ernest Mitchell for $3500. He had also considered a sale by J. C. Ford of 2½ acres east of Carriere for $2500. Other sales had been made in the vicinity of the Spiers property, but he did not think they would be comparable sales.

██ ■ We think the verdict of the jury in this case is grossly excessive, so excessive as to indicate bias and prejudice on the party of the jury. The testimony of all of the witnesses shows that the 336-acres of land owned by the appellees was rural land, far removed from the centers of population, and that the land was being used by the appellees as a cattle farm and for the grazing of horses; and there is nothing in the record to indicate that the land would be used for residential or commercial purposes at any time within the foreseeable future.

The testimony of the appellees' witnesses concerning the sale by Spencer Lumpkin to Carl Carlson of a three-acre building lot fronting on a blacktop highway about two miles east of Carriere for the sum of $3,000, and the sale of the 2½-acre lot situated in the village of Carriere by J. C. Ford to Central Service and Supply for $2,500, afforded no basis for a valuation of farm property devoted to the pasturage of cattle. The ap-

pellees' witnesses admitted that their opinion as to the before and after taking values of the Spiers property were not based upon any sales of reasonably comparable farm properties in the vicinity.

It can be readily seen that the appellees were entitled to substantial damages for the taking of the 43.78-acre strip of land for the limited access highway. The severance of the 167 acres of land lying east of the new highway from the remaining parts of appellees' land lying west of the new highway and the severance of the 68 acres in the southwest corner of the 336-acre tract from the remaining part of the land lying west of the new highway, was an element of damages which the jury had a right to consider in determining the value of the property left to the appellees after the taking of the 43.78-acre strip for right of way purposes. But there is no testimony in the record to justify an award of damages in the amount of $50,000. Spiers, testifying in his own behalf, stated that in his opinion the fair market value of the 336 acres before the taking was $64,900. The appellees had left after the taking 292 acres which, according to Spiers' own testimony, included a considerable portion of the best land that he owned. Neither the dwelling house nor the barn were included in the strip taken for right of way purposes.

After a careful review of the testimony we hold that the verdict for $50,000 was so grossly excessive as to evince bias and prejudice on the part of the jury. Miss. State Highway Comm. v. Roche, 249 Miss. 792, 163 So. 2d 874 (Miss. 1964); Miss. State Highway Comm. v. Taylor, 237 Miss. 847, 116 So. 2d 757 (1960); Miss. State Highway Comm. v. Pittman, 238 Miss. 402, 117 So. 2d 197 (1960); Miss. State Highway Comm. v. Valentine, 239 Miss. 890, 124 So. 2d 690 (1960); Miss. State Highway Comm. v. Rogers, 236 Miss. 800, 112 So. 2d 250 (1959); Miss. State Highway Comm. v. Ellzey, 237 Miss. 345, 114 So. 2d 769 (1959).

For the reasons stated the judgment of the circuit court will be reversed and the case remanded for a new trial on damages, unless within fifteen days from this date the appellees accept a remittitur of $17,500. In the event the appellees accept such remittitur the judgment will be modified and affirmed for the sum of $32,500; otherwise reversed and remanded.

Reversed and remanded unless the appellees accept the specified remittitur.

*Ethridge, Gillespie, Rodgers and Patterson, JJ.,* concur.